ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

CRAIG and others *against* THE UNITED INSURANCE
COMPANY.

The same *against* THE NEW-YORK INSURACE COM-
PANY.

The same *against* THE COMMERCIAL INSURANCE COM-
PANY.

*A vessel was insured from New-York to Barcelona. She was boarded during the voyage, off St. Michaels, by a British cruiser the commander of which, on the 20th of December, 1807, endorsed her register warning her not to enter any of the ports of France, Holland, Spain, Denmark, Italy, Portugal, or any other port from which the British flag was excluded, according to the British orders in council of the 11th of November, 1807. The*
master fearing *Algerine* pirates, and believing he should be liable to *British* capture if he proceeded to *Barcelona*, without first touching at a *British* port, put into *Gibraltar*, for advice; and there obtained permission to proceed on his voyage, but hearing of the *Milan* decree of the 25th of *December*, 1807, and the *Spanish* decree of the 3d of *January*, 1808, and being inform-ed that *Barcelona* was occupied by *French* troops, he abandoned the voyage, and returned to *New-York;* and the insured thereupon abandoned, as for a total loss. It was held, that the breaking up the voyage, and abandonment were not justifiable.

Neither the fear of intermediate capture in proceeding to *Barcelona*, nor of seizure there, was a sufficient cause of abandonment.

The insured cannot abandon *quia timet*, in cases where the danger is remote or contingent ; but if there be an absolute interdiction of commerce with the port of destination, so that the completion of the voyage is impracticable, or attended with a moral certainty of seizure and loss ; or if the port of destination be in possession of an enemy, or actually blockaded, *it seems* that the insured is not bound to proceed, but may abandon the voyage, and recover for a to-tal loss.

THESE actions were commenced on three separate policies of insurance. The policy in the first cause, was dated the 19th of *December*, 1807, on the *American ship*, called the *Amiable Matilda*, *Hilliard*, master, " at and from *New-York* to *Barcelona* and *Salon ;*" valued at 5,500 dollars. At the foot of the policy were the following written clauses : " Warranted *American* property, proof whereof, is required to be made here only. In case of capture or detention, not to abandon in less than six months after advice thereof, at this office ; or until after condemnation. If turned away for attempting a blocka-ded port, the assured to be at liberty to proceed to a port not blockaded, but not to be liable to loss, for seizure or detention, at the port of destination, in consequence of having touched, by choice or force, at a *British* port."

5

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

The policies, in the second and third causes, were on goods laden on board the same ship, " at and from *New-York* to *Barcelona;*" with a written clause, as follows : " warranted not to abandon, if captured, until condemned, or until after a detention of six months, after advice is received here of the capture."

The causes were tried at the *New-York Sittings,* in *June,* 1809, before Mr. Justice *Spencer.*

At the trial of the first cause, the plaintiffs produced as preliminary proofs, a letter of abandonment, dated the 12th of *March,* 1808, addressed to the defendants, as follows : " the papers herewith submitted to you will show the situation of the subject insured, which authorizes us, as we are advised, to make an abandonment. We do, therefore, hereby abandon to your company the ship, &c. and claim from you a payment of a total loss." The papers referred to and delivered to the defendants were an affidavit of the plaintiffs, that no other insurance had been made by them on the ship, and *three* letters from the master. The first letter, dated on board the *Amiable Matilda, Gibraltar Roads,* 5th of *January,* 1808, was as follows : " It is with extreme regret that I have to acquaint you of my coming into this place, 25 days from *New-York;* the cause of which was my having my papers endorsed by a *British* cruiser, forbidding me to enter any port in *France, Holland, Denmark, Portugal, Spain, Italy,* or any other port from which the *British* flag was excluded, at the same time furnishing me with a copy of the *British* orders in council, dated 11th of *November* last. I likewise was informed by an *American* vessel, that the *Algerines* were at war with the *United States,* had taken in a number of vessels ; and that the *American* consul, at *Gibraltar,* had sent out word for all *American* vessels bound up the *Mediterranean* to call at *Gibraltar,* for advice. Under these circumstances, I have thought it for the interest of all concerned that I should call here, where I find 20 or 30 sail of other vessels similarly si-

tuated, and more daily arriving, among which are several sail who had their papers, like myself, endorsed without the St. aits, and had passed the rock; after which they were captured for having passed *Gibraltar;* although sailing for *Malta,* they are sent in here, and are now waiting for trial. Not knowing the names of your friends in this place, I called on the friends of Messrs. *Compt and Co.* (the consignees,) Mr. *James R. Benson,* and Messrs. *Anderson and Co.* for advice; from whom and the *American* consul, I learn that I cannot go out until my quarantine is out, after which, as my cargo is comprised of such articles as will be admitted, we shall be allowed to proceed to my original port of destination, by taking a certificate of my having stopped here. I shall extend my protests, and proceed as fast as possible, after permitted, for *Barcelona,* where I hope, and think it probable, I shall be permitted to an entry, notwithstanding the misfortune of being forced to call here." &c.

" P. S. The difficulty with the *Algerines* is over," &c.

The second letter dated at the same place, on the 12th of *January,* 1808, was as follows :

" Since writing," &c. " I have made every exertion to get permission to proceed from quarantine, but have not been able to ; however, we are this day admitted to *pratique,* and have my protests made out, and permission to proceed to *Barcelona.* We have the appearance of a fine breeze to-morrow morning, for *Barcelona,* and I shall improve it, from whence I hope you will next hear from me. I have this day seen letters from Messrs. *Compt and Co.* dated the 2d instant, saying there was no difficulty in vessels coming to their place that had touched at *Gibraltar.* There is here a number of vessels similarly situated that are going to proceed on their voyages ; likewise a number that were bound to *French* and *Italian* ports which are pretty much determined to return home with their outward cargoes," &c.

The third letter, dated at the same place, the 18th of <span>ALBANY,<br>August, 1810.</span>
*January*, 1808, was as follows :

" Since writing to you, the 12th instant, the day I had    CRAIG<br>
*pratique*, I extended a protest and had cleared out, and  UNITED INS.<br>
was about getting under way, for *Barcelona*, when the   Co.
late *French* and *Spanish* decrees were received here ;
likewise, that *Barcelona* was occupied by *French* troops.
And I hear from Messrs. *Grevigne & Co.* in *Malaga*,
that they have not a doubt but the decree will be rigidly.
enforced which blasts our hopes of a voyage. I have
advised with the first mercantile houses in this place, and
concluded to return direct to *New-York*, as the best pos-
sible thing for your interest in this dreadful dilemma.
I shall sail with the first ships of force that go through
the gut, as a convoy, and make the best of my way home.
There will be 15 or 20 other vessels likewise that will re-
turn, and more daily arriving. *Algesiras* is full. The
boats are daily bringing in every *American* they board."

The counsel for the defendants objected, that these
papers did not contain sufficient evidence of the requisite
preliminary proofs ; and that the protest of the master
ought to be produced ; but the objection was overruled
by the judge.

The plaintiffs then produced the deposition of *Moses
Hilliard*, the *master*, the reading of which was objected
to, because it set forth a different cause of abandonment ;
but this objection was overruled, and the deposition read.

After stating the examination of his papers, and en-
dorsement of his register, by the *British* cruiser, off the
island of *St. Michaels*, the master deposed, that the com-
mander of the *British* ship informed him, that, in conse-
quence of the orders in council, he could not be per-
mitted to proceed in his intended voyage to *Barcelona*,
or to any other port referred to in the endorsement in the
register, without stopping at some *British* port ; and that
if he attempted to proceed to *Barcelona*, or to any of the
ports referred to in the endorsement on the ship's regis-

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

ter, the ship would be taken by any *British* vessel of war that might fall in with her ; and that the ship and cargo would, in consequence, be good prize and liable to con- demnation. That the *British* commander showed the de- ponent a newspaper containing the *British* orders in council of the 11th of *November*, 1807. That the ship, afterwards, proceeded on her voyage, and being in the *Gut of Gibraltar*, he spoke an *American* brig, the master of which informed him, that the *Algerines* had declared war against the *United States*, and had captured several *American* vessels, and that the *American* consul had advi- sed all ships bound up the *Mediterranean* to call at *Gibral- tar*, for advice. That, under these circumstances, believing that he could not prosecute his voyage to *Barcelona*, or go to any port referred to in the endorsement made on his register, nor to any free or open port in the *Mediterranean*, without subjecting the ship and cargo to capture by the *Bri- tish* or *Algerines*, and to a consequent total loss, he deemed it his duty, and for the benefit of all concerned, to stop at *Gibraltar* ; and accordingly put in there on the 3d of *January*, 1808. That the ship was immediately put on quarantine, and he found he could not proceed further, until he had performed a quarantine of 10 days. That there were 20 or 30 *American* vessels at *Gibraltar*, under the same circumstances ; and several *American* vessels, had been brought in by *British* cruisers, and libelled as prizes, in consequence of their having attempted to pur- sue their voyages up the *Mediterranean*, without stopping at *Gibraltar*, after having their registers endorsed. That on the 12th of *January*, 1808, he obtained permission from the government at *Gibraltar* to proceed on his voy- age, with the ship and cargo to *Barcelona*, on taking a certificate with him from certain officers at *Gibraltar*, of the ship's having touched there. That he was fully de- termined to pursue his voyage to *Barcelona*, but just as the ship was getting under way for that purpose, he re- ceived intelligence of the *French* and *Spanish* decrees

That these decrees were published in the newspapers at Gibraltar, one of which, purporting to contain a copy or translation of these decrees, the deponent received at Gibraltar, the 16th of *January*, 1808. That after taking the best advice he could obtain, and considering the great risk the vessel and cargo would run of being captured, if he attempted to proceed to *Barcelona*, or to any other port in the *Mediterranean* or *Europe*, from the number of *French* and *Spanish* privateers which were then out, and which he was informed and believed were daily capturing *American* vessels and carrying them into *Algesiras* and other *Spanish* ports, he deemed it best for the interest of all concerned to return back from *Gibraltar* to *New-York;* and, accordingly, after waiting for convoy until the 31st of *January*, he sailed from *Gibraltar*, under the protection of a *British* vessel of war through the *Straits of Gibraltar*, and arrived in safety at *New-York* on the 14th of *March*, 1808. That from the information he received at *Gibraltar*, as well as from what he has since received, he verily believes, that if he had proceeded on his voyage to *Barcelona*, or any other port in the *Mediteranean*, the ship and cargo would have been captured by the *French* and *Spanish*, and have been condemned. And that it was solely the fear of capture and condemnation, in proceeding on the voyage to *Barcelona*, or to any other port in the *Mediterranean*, which induced him to break up the voyage and return to *New-York;* but that from his knowledge of the consignees, and of their respectability and interest at *Barcelona*, he was persuaded that notwithstanding the *French* and *Spanish* decrees, if the vessel had arrived at *Barcelona*, both vessel and cargo might have been protected and saved from confiscation, by the interest of those to whom she was consigned.

On his cross-examination, the master stated, that after his register was endorsed by the *British* ship of war, his intention was to go to *Malta*, and not to *Barcelona*. That he went into *Gibraltar* on account of the news of an *Al-*

*gerine* war, and that he would not otherwise have gone into that port. That after he went into *Gibraltar* he heard that the *Algerine* war had ceased, but that as there was no *American* force in the *Mediterranean*, apprehensions were still entertained, that the war would break out again; but he should not, on that account alone, have refrained from prosecuting his voyage to *Barcelona*. That if the *Milan* decree and *Berlin* decree had alone existed, when he was at *Gibraltar*, he would not have proceeded to *Barcelona*. That, while at *Gibraltar*, he had no information from any persons in *Spain*, that it was understood there, that the *Spanish* decree would be carried strictly into effect, or that it would not. That he saw no letters at *Gibraltar*, nor had any information there to induce him to believe that the *Spanish* decree would have been enforced against the *Amiable Matilda* or her cargo, if she had arrived at *Barcelona*. That after his register was endorsed, he deemed it unsafe to proceed on his voyage without first stopping at an *English* port; and until he heard of the *Algerine* war, he intended to go to *Malta*, as being an *English* port, and from whence he might with more ease and safety reach his port of destination. That if when he left *Gibraltar* he had believed that he could have reached *Barcelona* in safety, he would have proceeded to that port.

The endorsement on the register of the *Amiable Matilda* was in these words : " Warned not to enter any of the ports of *France*, *Holland*, *Spain*, *Denmark*, *Italy*, *Portugal*, or any other port from which the *British* flag is excluded. Lat. 37 deg. 6 min. *north*, long. 20. *west*. 20th of *December*, 1807."

The counsel for the plaintiffs read in evidence the *British* orders in council, of the 11th of *November*, 1807, the *Milan* decree, of the 25th of *December*, 1807, and the *Spanish* decree, dated at *Aranjuez*, the 3d of *January*, 1808, and the *Berlin* decree, dated the 21st of *November*, 1806.

*Chace*, an *American* captain, deposed, that he was at ALBANY, *Algesiras*, in *January*, 1808 ; that there were a number of August, 1810. *French* and *Spanish* cruisers in the *Mediterranean*, and that *American* vessels, obnoxious to the *Milan* and *Aran-* juez decrees, could hardly have escaped capture; that *British* convoys frequently passed *Gibraltar*, and went up the *Mediterranean*, by which *American* vessels might have been protected, by sailing in their company, but without having sailing orders or signals ; that the priva- teers generally kept in shore, and the greatest danger from them was off *Algesiras*, and in the *Gut of Gibraltar ;* that had he been at *Gibraltar* when the *Amiable Matilda* was there, and bound to *Barcelona*, he should have pro- ceeded thither; and if he could have gone with a *British* convoy he certainly should have done so, if his vessel had not been liable to be seized on her arrival at *Barce-lona.*

CRAIG<br>v.<br>UNITED INS.<br>Co.

*Graham*, another witness, testified, that on account of a bar in the harbour of *Barcelona*, the *Amiable Matilda* would have been obliged to land more than half her car-go two miles from the city, where she would have been exposed, for some days, while unloading, to privateers.

The jury found a verdict for the plaintiffs, for a total loss. Similar verdicts were also found in the other two causes.

A motion was made in behalf of the defendants for a new trial; on the following grounds :

1. Because the preliminary proofs varied from the proofs at the trial, and did not show a right of action, at the time the suit was commenced.

2. There was no justifiable cause of abandonment, there being no total loss by any of the perils insured against.

3. Admitting a right to abandon, from fear of capture, the abandonment was premature.

*Wells*, for the defendants. 1. The preliminary proof is defective in form. It consisted merely of three let-

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

ters from the captain, with the usual affidavit, as to interest and other insurance. The abandonment should have been accompanied with the *protest* of the master, whose duty it is, whenever any difficulty or disaster intervenes, to make a regular protest, the first convenient opportunity. Proof implies something having the solemnity and authority of an oath. If the master actually made no protest, he failed in the performance of his duty; and the plaintiffs were not prepared to abandon and exhibit the requisite proof of loss. The best evidence is the protest of the master; it ought, therefore, to have been exhibited.

Again, the *cause* of abandonment, as stated in the letters exhibited as preliminary proof of loss, is different from what was given in evidence at the trial. When the insured makes an abandonment on a specific ground, he must, at the trial, be confined to it. He cannot show a different cause. In his letters, the master assigns as the reason for breaking up the voyage at *Gibraltar* and returning here, the apprehension of seizure at *Barcelona*, his port of destination. In his deposition, read at the trial, he states the reason of his return home, to be the fear of his intermediate capture by the *French* and *Spanish* cruisers. The averment in the declaration also states, the apprehension of capture by *French* and *Spanish* cruisers, as the cause of breaking up the voyage.

2. But putting the cause on the ground taken by the plaintiffs at the trial, the question is, whether that was a justifiable cause of abandonment. The cause assigned by the master, in his deposition, is a fear of capture and condemnation by the *French* or *Spanish*, under their decrees, while proceeding from *Gibraltar* to the port of destination; for he expresses his confidence, that if the ship had arrived at *Barcelona*, she would not have been seized there. The cause of abandonment, then, is *fear of capture.*

2

That a just and reasonable apprehension of capture may excuse a *deviation*, is not denied; but this, I believe, is the first time that fear of capture has been thought sufficient to justify an abandonment. The misapprehensions, miscalculations, and erroneous judgment of the master are at the risk of the insured, not the insurer.

The case of *Schmidt* v. *The United Insurance Company*,* certainly goes further than any of the *English* decisions; but that case differs from the present. There the vessel was twice warned not to proceed to the *Elbe*, being blockaded; and had she, afterwards, proceeded, she would have been liable to condemnation. If she had gone on, afterwards, and attempted to enter the *Elbe*, she would have violated the law of nations. It is true, Mr. Justice *Livingston*, in giving his opinion in that case, says, "it is sufficient to justify the master's conduct, in cases of this kind, if he has good reason to apprehend that a capture will be the consequence of going on; and he cites *Targa*, *Casaregis* and *Emerigon*, in support of his position.

*Emerigon*† states, that the 26th article of the *French Ordinance* forbids the captain from abandoning the vessel, during the voyage, on account of any danger whatever, without the advice of the principal officers and the crew."‡ But the advice only of the officers and crew is not sufficient to justify the master in abandoning the ship; there must be a just cause for such a step. The danger must be imminent, and resistance impossible, or ineffectual. As the fear of being made a slave, or prisoner, is a just cause of abandoning the vessel, where there is an impossibility of defending the ship. *Emerigon* cites *Targa* and *Casaregis*, to illustrate his idea of a well grounded or just fear, and then puts several cases, by way of example. The *first* case, is that of a vessel bound from *Candia* to *France*, chased by a *Turkish* ship

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

* 1 *Johns. Rep.*
249.

†*Emerigon*, vol.
1. p. 507.

‡ *Valin*, sur
*L'Ord. Mar.*
*liv.* 2. *tit.* 1. *Du*
*Cap. art.* 26.

of war, and the captain and crew took to their boat and escaped to *Zante*.

In the second case, the captain of a vessel, richly laden, came in sight of a ship of 30 guns, which he supposed to be a *Barbary corsair*; and he abandoned his vessel, in his boat; and it afterwards appeared that the ship of war was in fact a *French* cruiser. In the *third case*, a *French* ship, returning from *America*, stranded on the *Barbary* coast, and while the crew were engaged in getting the ship off, the *Moors*, with whom *France* was then at war, appeared in sight, and the captain and crew took to their boat and left the vessel. The fourth case was that of a vessel, off *Majorca*, chased by an *English* cruiser, and the captain and crew abandoned their vessel, and went on shore. Another case was that of a vessel, forced by stress of weather to cast anchor, near *Mahon*, and, during the night perceiving a ship, which they supposed to be a *Barbary* pirate; the captain and crew went ashore to obtain assistance, and soon after their vessel was discovered to be on fire. Other cases are also mentioned, as where the plague broke out on board of a vessel; and where a vessel was in imminent danger of shipwreck.

All the cases put by *Emerigon*, or the authors who are cited, are those in which there was a present physical force, and imminent danger. In the present case, the danger, if any, was distant, uncertain and speculative; it was a mere belief or apprehension of a probable or possible danger, arising from general report or information. This case, then, is widely different from any which has been cited. One of the witnesses, at the trial, was of opinion, that the vessel might have reached *Barcelona*, without being captured, though it was likely she might have been taken.

*Emerigon* mentions the case of a vessel bound from *Marseilles* to *Martinique*, which having met with violent gales, by which she was dismasted, put into *Carthagena*, and afterwards pursued her voyage; but meeting

*Emerigon, vol. 1. p. 594.

with heavy seas, which increased the water in her hold, she put into *Gibraltar*, and afterwards returned to *Marseilles*, for fear of becoming innavigable and shipwrecked, and was abandoned to the insurers. It was held, that the insured could not recover, as the judges, at *Gibraltar*, did not pronounce the ship to be innavigable, and because the *fear* of a misfortune is not the misfortune itself.

In the case of *Lubbock* v. *Rowcroft*,* goods were insured from *London* to *Naples*, *Leghorn*, or *Messina*, with liberty to touch at any port in the *Mediterranean;* and the vessel on arriving at *Minorca*, found that *Messina* was in the hands of the *French*, or blockaded by them; in consequence of which, the insured abandoned for a total loss. Lord *Ellenborough* held, that the abandonment was from an apprehension of capture from an enemy, and not a loss within the terms of the policy; and the plaintiff had no right to abandon. *Erskine*, who argued for the plaintiff, observes, that the case then before the court; " was not merely *quia timet*, as if there were 100 *French* vessels covering the seas; in which case, though the probability was great of the ship's being captured, she might escape; but here the port was in possession of the enemy, so that her capture was certain." Thus admitting, that in a case like the present, a fear of capture, or a probability of capture, would not be a sufficient cause of abandonment.

In the case of *Blackenhagen* v. *The London Insurance Company*,† the goods were insured from *London* to *Reval*, in *Russia*. The ship sailed under convoy, and arrived in the *Sound;* and while proceeding towards *Reval*, the captain of the convoying ship received information, that an embargo was laid on all *British* ships in the ports of *Russia*. The vessel put back, and lay off *Gottenburgh*, a friendly port, where she might have entered; but she sailed with a fleet for *England*, and was lost on her voyage

*Margin notes:*

ALBANY,
August, 1810

CRAIG
v.
UNITED INS.
Co.

* 5 *Esp.* Cases, 50.

† 1 *Campbell's N. P.* Cases, 454. and note. *Park*, (6 ed.) 226, 227.

home. Lord *Ellenborough* said the case would hardly bear to be stated. The underwriters were bound to indemnify the plaintiff for any loss that should happen on her voyage from *London* to *Reval;* but by sailing back to *England,* in the manner she did, the original voyage was abandoned, and the underwriters discharged.

In the case of *King* v. *The Delaware Insurance Company,** decided in the circuit court of the *United States,* for the district of *Pennsylvania,* in *April,* 1809, the insurance was from *Philadelphia* to the *Isle of France.* During the voyage the vessel was stopped by a *British* sloop of war, and warned from proceeding to any port in possession of the enemies of *Great Britain ;* and the captain was told, that the *Isle of France* was blockaded, and he would be a prize, if he proceeded ; in consequence of which he returned to *Philadelphia,* where an abandonment was made. Judge *Washington* held, that the detention, and warning by the *British* vessel were no cause of abandonment. That the *Isle of France* not being, in fact, blockaded, there was neither a legal nor actual force, to prevent the ship from entering her port of destination, except the casual danger arising from capture by privateers ; and that the master was bound to proceed until the danger of actual loss was manifest.

In the case of *Atkinson* v. *Ritchie,*† the court of *King's Bench* held, that a *restraint of princes,* which would excuse the master of a vessel for not delivering his cargo, at the port of destination, agreeably to the charter-party, means an *actual* and *operative* restraint, and not a merely expected and contingent restraint.

We shall, probably, be told, that the master is bound to exercise a sound discretion, under existing circumstances ; and if he acts *bona fide,* all parties are bound by his acts. This is generally true ; but the rule has many exceptions. The master must take care that he exercises his discretion under proper circumstances ; and the question recurs, whether the circumstances of the present case

* *MS. case.* See note to *Condy's* edition of *Marshall on Insurance,* vol. 1. p. 81. 220.

† 10 *East's Rep.* 530.

did justify the exercise of his discretion. Capture is one of the perils insured against, and the master has no right to exercise his discretion as to a probable capture. He cannot take upon himself to abandon the voyage from an apprehension of one of the perils against which the insurer has undertaken to indemnify the insured. If this were permitted, then the insurer who is liable in a case of actual capture, would be equally liable, also, when the master abandons the voyage, from a fear of capture. In the present state of the world, a vessel cannot sail in any direction, without danger of capture. It appears from the evidence, that the principal danger of capture, was in the neighbourhood of *Algesiras;* and that the *Amiable Matilda* might have sailed under *British* convoy, though without sailing orders and signals. She had also a *British* certificate or passport. A master of a vessel, who was a witness, said, he should have gone on the voyage, under the circumstances. Here, then, is a contrariety of opinion, and two cases might happen in which the insurers would be liable; one, where a vessel returned home, and the other, where she proceeded on her voyage, and was lost.

But if the fear of capture is a cause of abandonment, it must appear, that there were just grounds for the apprehension.

The master says, if the *Berlin* and *Milan* decrees had alone been in operation, he would not have proceeded for *Barcelona.* He was not, then, influenced by the *Spanish* decree: and if by the *Berlin* and *Milan* decrees he would not have been liable to capture, he had no ground whatever for his apprehension.

By the 7th and 8th articles of the *Berlin* decree, it is declared, " that no vessel coming directly from *England* or her colonies, or having been there since the publication of this decree, shall be admitted into any port." And, " that every vessel that by a false declaration, contravenes the foregoing disposition, shall be seized,

ALBANY,<br>August, 1810.<br><br>CRAIG<br>v.<br>UNITED INS.<br>CO.

and the ship and cargo confiscated, as *English* property."
Now, the *Amiable Matilda* was not coming from *England* or her colonies. Besides, it is a mere municipal regulation of *France*, excluding vessels, under certain circumstances, from entering into *French* ports.

The 1st and 2d articles of the *Milan* decree declare, " that every ship, to whatever nation she may belong, that shall have submitted to be searched by an *English* ship, or to a voyage to *England*, or that shall have paid any tax whatever to the *English* government, is thereby, and for that alone, declared to be denationalized, to have forfeited the protection of its king, and to have become *English* property." And, " that if the ships thus denationalized by the arbitrary measures of the *English* government, enter our ports, or those of our allies, or whether they fall into the hands of our ships of war or our privateers, they are declared to be good and lawful prize."

The word *search*, in the law of nations, is a technical term. It is the exercise of the right claimed by the belligerents to examine and search neutral vessels, in order to ascertain, whether there be enemy's property, or contraband goods on board. The *Amiable Matilda* was never *searched*, but merely boarded. She was not bound to *England*, nor had paid any tax to the *English* government; she was not, therefore, liable to condemnation under this decree. If this be correct, then the fear of the master was groundless.

If the doctrine contended for by the assured is to prevail, within what bounds is the master to be circumscribed, in the exercise of his discretion ? Suppose, that on the day after he left *New-York*, he had met vessels from the *Mediterranean*, or *Europe*, who informed him, that if he proceeded he would be liable to capture ; nay, suppose that he was so informed while in the port of *New-York*, would he be allowed to abandon the voyage, and the insured entitled to recover for a total loss ?

*Colden* and *T. A. Emmet*, contra, 1. The peculiar clause, in the *New-York* policies, requiring proof of interest and loss to be exhibited to the insurers, thirty days before any action is commenced, has been frequently under the consideration of the court.* All that is required is reasonable evidence; not full and legal proof of loss. And letters from the master have been deemed sufficient.† The *protest* of the master is not legal evidence at the trial; it ought not, then, to be held indispensable to the preliminary proof. Proof of interest is not always made under oath. The exhibition of the original invoice and bills of lading have been held sufficient for that purpose.

2. It is objected, that the cause of abandonment assigned by the letters of the master, is different from the one stated in his deposition, read at the trial. The letters not only state the danger of capture, while proceeding from *Gibraltar* to *Barcelona*, but also, that *Barcelona* was occupied by *French* troops, and, consequently, a certainty of being seized and condemned there. The abandonment refers to the letters generally, and the plaintiffs have a right to recover on all the grounds stated in those letters. There are three distinct circumstances; 1. That *Barcelona* was occupied by *French* troops; 2. That *French* and *Spanish* privateers swarmed in the *Gut of Gibraltar*, and were capturing all vessels they met with; 3. The *French* and *Spanish* decrees, which were rigidly enforced. The declaration avers all these circumstances as the cause of abandonment and loss. Under those decrees the *Amiable Matilda* was liable to capture and condemnation. She had been searched by a *British* cruiser, and had gone into a *British* port. It was not necessary that the hatches should have been broken open, and the cargo overhaled, to constitute a *search* or *visit*, in the sense of those decrees. The examination of the ship's papers and endorsing her register, was an *act* of *search*.

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

* *Talcott* v. *Mar. Ins. Co.* 2 *Johns. Rep.* 136. *Lenox* v. *United Ins. Co.* January term, 1802. 3 *Esp. Cases,* 242.
† 1 *Johns. Rep.* 183. 187.

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

Then, were not the fears of the master well founded ? If so, the abandonment of the voyage was justifiable. One of the perils insured against is, the "arrest or detainment of princes," &c. These words are not confined to actual capture and detention. *Restraint* has a larger and more extensive sense : it is a prohibition by a power having competent authority and means to enforce such prohibition, in case of disobedience; as in case of an *embargo* or *blockade.* It is possible that the vessel may evade an *embargo,* or elude a blockading squadron; but she is not bound to make the attempt; it is enough that the prohibition proceeds from a power able to enforce its observance.

* 3 *Bos. & Pull.* 388.

The case of *Hadkinson* v. *Robinson** does not touch the present. The declaration in that case did not aver, that the shutting the port of *Naples* was a hostile measure, and not a mere municipal regulation. Judge *Livingston,*† speaking of that case, says, the only point determined was, that if a perishable cargo be sold at a loss, at an intermediate port, in consequence of advice received, during the voyage, of the port of destination being shut by the government of the country, it is not a total loss within the policy." The case goes no further than a denial of entry, with the additional circumstance of the goods being perishable.

† 1 *Johns. Rep.* 264.

Judge *Livingston* also observes, in giving his opinion in the case of *Schmidt* v. *The United Insurance Company,* that the voyage may be abandoned, if the master " has good reason to apprehend, that capture will be the consequence of going on;" and he adopts the language of *Targa* and *Casaregis,* that "a just fear is a kind of violence;" that " fear, credulity, or even the error of the master," will excuse him for abandoning his ship. In the present case, the plaintiffs prove, not a mere apprehension of danger, but an actual and existing danger, arising from the great number of cruisers and privateers in the *Gut of Gibraltar.*

It seems to be considered by the defendants' counsel, that the master is bound to proceed, at all events, and encounter every peril enumerated in the policy. But this is unreasonable, and against the interest of the insurer. Suppose, after the vessel has commenced her voyage, a war should break out between the two countries; must the vessel proceed until she is captured?

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

In the case of *Speyer* v. *The United Ins. Co.*† the counsel for the defendant say " the insured, knowing of the prohibition of the *French* government, was not bound to proceed to *France*, but might have put an end to the voyage."

* 3 *Johns. Rep.* 92.

In the case of *The Marine Insurance Company of Alexandria* v. *Tucker and others*,† the supreme court of the *United States*, considered the loss of the ship's register, in consequence of a capture and recapture, as a sufficient cause for breaking up the voyage; and that had the captain proceeded, he would have been chargeable with culpable misconduct.

† 3 *Cranch's Rep.* 396. 307.

The point decided in the case of *Lubbock* v. *Rowcroft* is the same as that in *Hadkinson* v. *Robinson*. In the case of *Blackenhagen* v. *The London Assurance Company*, there was, in fact, no interruption of the voyage; and the loss was there laid, in one count of the declaration, to be by the perils of the sea, and in the other, by capture. And that was the case of a temporary embargo at the port of destination.

The cases stated by *Emerigon* are for the purpose of showing when a master may abandon his ship, without a breach of his duty. But the abandonment of his voyage, where there is an insurance, is a different case, not governed by the same reason. There is not the same strict necessity in the one case as in the other. The maritime law rigidly requires of the master never to desert his ship, until compelled by superior force. May not the merchant abandon his voyage, for a danger less imminent and pressing, than what would justify a master in

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

* 9 East, 285.

abandoning his ship ? It is a part of the contract of insurance, that when the voyage is not worth pursuing, the merchant may abandon it, and throw it on the insurer.

In the case of *Barker* v. *Blakes** it was decided, that where a neutral ship bound to *Havre*, was detained and brought into a *British* port, and pending the proceedings in the admiralty, the port of *Havre* was declared to be in a state of blockade, the ship, after being released, was not bound to pursue her voyage to the blockaded port, but that the assured might abandon as for a total loss. What is a blockade? It is not capture; but a danger of capture. The court of *K. B.* made no subtile or refined distinctions. They considered this danger arising from the blockade, as an impossibility to prosecute the voyage. But, in fact, it is not an impossibility, for the blockading squadron may be blown off, so that the ship might enter the port of destination. This case and that of *Schmidt* v. *The United Insurance Company*, establish the principle, that danger of capture is a ground of abandonment; that when there is an actually existing blockade of the port of destination, the ship is not bound to proceed to, or go within the line of blockade; but may abandon the voyage.

The case of *King* v. *The Delaware Insurance Company* has no bearing on the present. There was no real existing danger in that case; for the port of destination, the *Isle of France*, was not blockaded; and the court decided, on that ground, that it was a mere apprehension of danger, where none existed. Judge *Washington*,† it is true, in speaking of the case of *Schmidt* v. *The United Insurance Company*, says, that this court overlooked the case of *Lubbock* v. *Rowcroft*, or it would have, probably, shaken the opinion of some of the judges; but the *fifth* volume of the reports of Mr. *Espinasse*, which contains that case, was not published until 1807, and could not, therefore, have been known to this court, when the case of *Schmidt* v. *The United Insurance Com-*

† 1 *Marshall*, 2. (ed. *by Condy*,) p. 220. in *note*.

pany,* was decided, any more than the case of *Barker* v. *Blakes*† was known to that learned judge, when he gave his opinion, in the case of *King* v. *The Delaware Insurance Company*.‡ This last case was carried by writ of error to the supreme court of the *United States*, who, in giving the judgment, affirming the decision of the circuit court, say, that the *Venus* did not come within the interdiction of the *British* orders, of the 11th of *November*, and that the endorsing of her register, and the warning given her, by the *British* officer, was unauthorized, and the information erroneous, so that the master of the *Venus* knew, or might have known that no danger, in fact, existed.

In the case of *Lubbock* v. *Rowcroft*, the goods insured belonged to a citizen of *Messina*, and it is the policy of the *British* courts, where the violence which produces the loss proceeds from a foreign country, to throw it upon the citizens of that country. But the case of *Barker* v. *Blakes*, decided by the whole court of *king's bench*, five years after the *nisi prius* decision of *Lubbock* v. *Rowcroft*, completely overthrows the argument of *Erskine*, and the hasty opinion given by Lord *Ellenborough*, in the latter case; for the court expressly say, that danger of capture, arising from the blockade of the port of destination, or *quia timet*, is a ground of abandonment.

The danger of capture, *in transitu*, as well as from the *French* decree, was real and existing; and it was necessary that the ship should wait two or three days, off *Barcelona*, to be lightened, before she could get into port; a circumstance which must have greatly increased the danger. Again, there was the danger of hostile capture, and confiscation, in the port of destination. We say, capture; for this decree is not of the nature of a mere denial of entry; and this court must, in the present or some other case, decide, whether seizures, under these decrees, are mere municipal proceedings and regulations, or acts of hostility. The ship had been *searched;* a belligerent right had been exercised; and the register was

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

* 1 *Johns. Rep.* 249. *May*, 1806.
† 9 *East* was published in 1808.
‡ *April*, 1809.

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

endorsed, as the evidence of the exercise of such right. By this act, and the going into *Gibraltar*, she became liable to seizure and confiscation, under the *French* and *Spanish* decrees. Vessels described in those decrees are declared *denationalized*; that is, they are no longer considered as belonging to a neutral nation, but as hostile and belligerent property, and liable to capture, on the high seas, as enemy's property. If so, a seizure, in the port of destination, is a hostile act. The danger of loss is as certain, as it would be in case the vessel should go into an enemy's port. It is decided, that if the port of destination be actually blockaded, or in the hands of an enemy, the insured may abandon; then, why may he not also abandon, when the port is in possession of a power, which has declared she will treat you as an enemy?

To every purpose, commercial or political, this vessel was put into a state of war, in regard to the power in possession of *Barcelona*; not by the act and consent of the plaintiffs, but by a power which they could not control. A vessel, without any fault of the owner or master, but rightfully and lawfully going into *Gibraltar*, is, by a superior power, prohibited from entering her port of destination, under penalty of being considered as hostile property, and liable to seizure and confiscation. Can it be said, that it was the duty of the master to proceed, in such a case? Would it not have been culpable misconduct in him to have proceeded, when no good purpose could be attained, and his ship would be liable to seizure and condemnation, had he reached his port of destination? It was impossible to proceed without imminent and unavoidable peril; and it is against peril that the insurance is made.

*Hoffman* and *Harison*, in reply. Admitting that a danger of seizure in the port of *Barcelona* existed, that would not justify an abandonment to the *United Insurance Company*; for there is an express clause in their

policy, which provides that they shall not be liable for a seizure in the port of destination, in consequence of having touched at a *British* port. If the plaintiffs could not abandon, in case of actual seizure or detention, until after six months ; *à fortiori*, they cannot abandon for fear of a seizure or detention.    Again, they cannot now rely on the fear of seizure at *Barcelona ;* for the master expressly says, that he had no fear of seizure there ; and that, had it not been for the *Berlin* and *Milan* decrees, he would have proceeded.

The plaintiffs claim for a technical total loss, by reason of a well grounded fear of capture, during the voyage to *Barcelona ;* or the certainty of a seizure in that port. On the first ground, the fear of peril is substituted for the peril itself. This is a new species of technical total loss. To bring this case within the words, " restraint of princes," there must be an *actual* and *forcible* detention, as by capture or seizure ; or a *virtual* and *legal* detention, as by embargo or blockade. A *virtual* but *illegal* restraint is not a cause of abandonment. If the decrees of *France* were municipal regulations, the plaintiffs cannot recover. If they were under the law of nations, and justifiable, then they might abandon : if they were hostile or belligerent decrees, then, war having intervened, the contract was dissolved : if not authorized by the law of nations, there was no ground for abandonment ; for a a neutral cannot abandon for fear of an illegal and unauthorized capture.

The insured is bound to prosecute the voyage, unless prevented by some of the perils enumerated in the policy. There are certain cases in which he will be excused. If a war intervenes, between the country from whence he sails, and that to which he is destined, the contract is dissolved. If an embargo be laid, the contract of insurance is not dissolved ; but the insured may break up the voyage, and throw the loss on the insurer ; for it is lawful for every nation to lay an embargo, and it would be unlawful for the master to attempt to

ALBANY,<br>August, 1810.<br><br>CRAIG<br>v.<br>UNITED INS.<br>Co.

break it. So, a belligerent has a right to blockade the ports of his enemy; and it is unlawful for a neutral to attempt to violate it; that is, an actual and existing blockade. There is not another case, except actual capture, which can justify an abandonment of the voyage. The case of arbitrary and illegal decrees of belligerents, is far different; for it cannot be unlawful to attempt to evade such decrees. The court, then, must decide on the nature of those decrees.

We are to presume, that every government will afford redress for illegal and unjust captures. The insured, then, must meet the case, and merit the indemnity, by performing his part of the contract, and prosecuting the voyage. The insured is not to be deprived of the right of resorting to his own government to obtain redress, and have a ruinous speculation thrown upon his own hands. Privateers may be avoided; and were, in fact, avoided by the captain, on his return. There is always a chance of escaping capture. Admitting a probability of seizure, in the port of *Barcelona*, it was not certain. These decrees are sometimes executed against one nation, and not another. The caprice of the despotic ruler of *France* may have induced a revocation of them, and *Spain* would have followed his example. . .

The case of *Barker* v. *Blakes* was that of a *blockade*, which it would have been unlawful for the insured to violate. In *Schmidt* v. *The United Insurance Company*, there was also a *blockade*. We admit, that an *actual* seizure or detention, however illegal and unjustifiable, is a just ground of abandonment; but not the *fear* or apprehension of such a seizure. The insured cannot act on the presumption, that a nation will do an unauthorized and violent act; or that, if such act should be done; that it will not be reversed or redressed. Is this court prepared to say that these decrees were legal, and authorized by the law of nations?

KENT, Ch. J. delivered the opinion of the court. An
objection was made to the sufficiency of the preliminary
proof which accompanied the offer to abandon. It was
said that the protest of the captain was a necessary docu-
ment which ought to have been communicated. It is a
sufficient answer to this objection, that the abandonment
was made before the arrival of the ship at *New-York*, and,
consequently, before the plaintiffs were in possession of
any protest.

The preliminary proof consisted of an affidavit of two
of the plaintiffs, as to the interest, and of three letters of
the captain, which contained the information of the
warning given by a *British* cruiser, of the orders in
council, of the cause of going into *Gibraltar*, and the
subsequent leave to depart, and of the existence of the
*French* and *Spanish* decrees. When the captain, after-
wards, in his deposition, which was read upon the trial,
assigns, as the reason for breaking up the voyage, the
apprehension of capture, in going from *Gibraltar* to *Bar-
celona*, the danger must have been understood to arise
from those decrees authorizing the capture. The va-
riance was not essential, in substance, between the cause
assigned in the deposition and in the preliminary proof;
and if there be any variance, the party must undoubtedly
be confined to that which was assigned to the defendants,
as the justifiable cause of abandonment.

It becomes unnecessary for me to dwell upon this
point, and I proceed to consider the important question,
whether the existence and notice of these decrees, un-
der the circumstances in which the ship was placed, at
*Gibraltar*, when the captain broke up the voyage, created
a technical total loss within the policy.

The peril, if any, arising from the decrees, consisted
either in the danger of capture, in the passage to *Bar-
celona*, or of seizure and confiscation after arrival there.

I have no idea that the apprehension of capture *in
transitu*, between *Gibraltar* and *Barcelona*, afforded a

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

justifiable ground of abandonment. That proposition is wholly destitute of authority. It would lead to inconvenient and extravagant consequences, and confound all distinction between imaginary or apprehended danger, and danger present and palpable. In the cases cited by *Emerigon*, (*tom.* 1. 507 to 512.) in which a just fear of one of the perils insured against, was held equivalent to *force majeure*, and sufficient to charge the loss upon the insurer, the danger was imminent, apparently remediless, and morally certain. *Targa* says, that a just fear is a species of violence and justifies an abandonment of the ship; and *Emerigon* admits the same thing. But the cases which are given, by way of illustration, explain what is meant by a just fear. It is a fear of being made a slave, or a prisoner, or of perishing in a case of extremity, or when defence becomes impossible. Thus the barque *Notre Dame des Reliques*, in coming from *Candia*, was met and pursued by a *Turkish* vessel of war, and the captain and crew, to avoid capture and slavery, (for the vessel had been carrying warlike stores to a place besieged by the *Turks*,) abandoned the vessel, and the insurers were finally, upon appeal, condemned to pay the *loss*. So, also, the *Marie-Therese* was stranded on the *Barbary* coast, and the crew, after labouring to relieve the vessel, abandoned her, for fear of being discovered by the subjects of the king of *Morocco*, with whom *France* was then at war. The vessel afterwards floated, and was recovered, and the insurers were held responsible for a proportion of the salvage. Again, the pink *Jesus-Maria* struck upon a rock, and the captain and crew, fearing to perish, escaped to the shore; a flaw of wind afterwards relieved the vessel, and she was conducted into port. This was held to be a case of just fear, and equivalent to the *vis major*, and the insurer was chargeable with the loss. On the other hand, a different decision was made in the case of the *St. Louis*, (1 *Emerig.*

594.) which being much injured by tempests, on a voyage from *Marseilles* to *Martinique*, put back to *Marseilles*, and was abandoned to the insurer, on the ground that the ship returned from the fear of becoming altogether innavigable, and of shipwreck. The right of recovery was denied; because the incompetency of the vessel had not been pronounced by the competent tribunal, and because the fear of misfortune was not the misfortune itself.

In *Lubbock* v. *Rowcroft*, (5 *Esp. N. P.* 50.) Lord *Ellenborough* held, that an abandonment, from an apprehension of capture, was not warranted by the policy; and this principle has received the sanction of Judge *Washington*, in the case of *King* v. *The Delaware Insurance Company*. There cannot be much doubt as to the correctness of the general rule. The only difficulty consists in the application of it to different cases. In one of the cases already mentioned, the vessel was abandoned, from an apprehension of capture; but the danger was so near and so certain as to be equivalent to violence, and to justify the assured. I should doubt, also, of its application in the very case of *Lubbock* v. *Rowcroft;* for if it be discovered that the port of destination has fallen into the hands of an enemy, the danger of the voyage becomes imminent and certain. The voyage is broken up by actual "restraint of princes." It would be equally absurd and unlawful to pursue it. But, in the present case, the danger of capture, *in transitu*, was only contingent. There was no reasonable certainty of capture. A belligerent vessel might always be abandoned on that ground, without venturing on the ocean; for to such vessels, there is always more or less danger of capture, as there is of shipwreck. It is this very risk which the assured must encounter, and against which the insurer is to indemnify.

But I dismiss this point, which it was unnecessary ever to touch; because the danger of intermediate capture does not appear to have been stated to the defend-

ants, as a substantive ground of abandonment; and the plaintiffs must confine themselves to the reasons communicated to the insurer; for on them alone was the insurer called upon to judge and to act.

The only danger, if any, that could support the abandonment, was the danger of seizure at *Barcelona*, under the *Aranjuez* decree; and I think it would be going too far, and beyond any precedent, to adjudge that cause to be sufficient.

This is not the case of an " illicit or prohibited trade," within the exception in the policy. If the defendants are exempted from the loss, it is upon more general principles.

If the port of *Barcelona* had been absolutely interdicted, so that the prosecution of the voyage to a conclusion, had become impracticable, or been attended with a moral certainty of seizure and loss, I should have deemed it equivalent to actual restraint, to the existence of a *vis major* breaking up the voyage; and that the plaintiffs had ground for their claim. An interdiction of commerce with the port of discharge, happening *after the commencement of the risk*, authorizes the assured to discontinue the voyage, and return at the risk of the insurer. (1 *Emerig.* 544.) And in the case of *Schmidt* v. *The United Insurance Company*, (1 *Johns. Rep.* 249.) it was decided in this court, that a blockade of *Hamburgh*, the port of destination, commenced and existing, in fact, after the voyage had begun, and duly notified to the insurer, after he had arrived on the *English* coast, was a " restraint" within the policy; and, if I am not mistaken, the case of *Barker* v. *Blakes* (9 *East*, 283.) establishes the same doctrine. When such restraint actually exists, and is ascertained to be effectual, and no doubt arises of its being exerted, it would be most unreasonable to require the assured to go on, and submit to the experiment of a capture, or the imminent hazard of the attempt. It would be fatal to the interest

of all concerned. It would be against the *duty* of the assured, and he would be placed under a moral inability to do it. I admit the good sense of the rule, that the assured shall not abandon *quia timet*, in cases in which the danger is remote or contingent, as where storms, cruisers of an enemy, or pirates, threaten a vessel, *in transitu*. But I do not perceive the fitness of its application to cases, in which the port of destination is discovered, and duly ascertained, in the course of the voyage, to be shut, by being in possession of an enemy, or by interdiction of trade, or by a blockade. The restraint is as much felt, and operates as effectually, as if the vessel was actually seized. The act of entry, and the attempt to do it, become unlawful. It is as unlawful to rush into the arms of an *enemy*, with your property, as it is to break a blockade, or force an entry into a port, when an entry is prohibited by the sovereign of such port. There may be doubts, as to the *terminus a quo*, or from what point the voyage is to be abandoned, and what species of demonstration of the danger, the assured ought to require. But assuming the *fact* of the existence of such an impediment, and of the reasonable certainty, that it would be made effectual, to the loss of the subject insured, the assured is justified in giving up the voyage and calling on the insurer to indemnify. It amounts to a loss of the voyage. No deviation can help the party, for the peril existed at the port of discharge; and if the restraint is not limited, or transient, the *spes recuperandi*, as to the voyage, is as much gone, as if the vessel was detained, in the course of her voyage, by an embargo or capture. I am aware that some late cases (*Hadkinson* v. *Robinson*, 3 *Bos. & Pull.* 388. *Lubbock* v. *Rowcroft*, 5 *Esp. N. P.* 50. *Blackenhagen* v. *London Insurance Company*, 1 *Campbell's N. P.* 450.) go very far towards denying this right to the assured, if an *English enemy* creates the impediment; but in this respect, I cannot, at present, concur in the distinction which they seem to assume, and when the case arises I shall choose to give it further consideration.

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

In the present case, however, I do not think that the port of *Barcelona* was shut, so as to bring the case within the reach of the principle. It was not shut generally, or absolutely, against *American* vessels. There was no general interdiction of trade with that port. The *Spanish* decree of the 3d of *January*, 1808, which operated at *Barcelona*, applied only to neutral vessels, under certain special circumstances; and whether the *Amiable Matilda* came within the operation of that decree, was a matter of uncertainty, depending upon the judicial construction which the decree might receive, in its application to that case.

The *Milan* decree, of the 17th of *December*, 1807, did not, by the terms of it, apply to the case; for it only applied to ships, which "should have submitted to be searched by an *English* ship." The *Amiable Matilda* did not submit to be searched. She was only brought to, and boarded, by an *English* cruiser, and her register endorsed. Whatever presumption that fact might afford of a search; yet it was not true, in fact, and the presumption was capable of being destroyed by positive proof. The *Spanish* decree was broader in terms, for it applied to every vessel, "which might have been *visited* by an *English* ship."(a) But this decree, professed to be grounded on the *Milan* decree, and to adopt "the same measures." It accordingly follows that decree, in almost its very words; and if it deviates in any minute particular, it is, probably, owing to the difference of language, and the changes in translation. It must be considered *in pari materia*, as part of the same system, as a

(a) The *Spanish* word *visita* and the *French* *visite*, mean precisely the same as the *English* word *search*, a species of judicial inquiry, or a formal act of search, in regard to ships, exercised, under the law of nations, by belligerents, towards neutrals. But there is a difference of opinion among writers on the law of nations, as to the manner in which the right of search is to be exercised. *Hubner* (*De la saisie des Batimens neutres*, c. 3. s. 5, 6, 7, 8, 9.) is of opinion, that it ought to be confined to an examination of the ship's papers; and the mode of search has been regulated in numerous treatises. (See 2 *Azuni's Marit. Law*, 201—220. c. 3. *Vattel*, b. 3. c. 7. s. 114.)

commentary on the same text, and as, by no means in-

tended to have a more extensive or rigorous operation.

It was, therefore, doubtful, whether the *Amiable Matilda* could, by any sound judicial decision, have been adjudged liable to seizure and confiscation, at *Barcelona*, under the *Aranjuez* decree. But to make out a just ground of abandonment from this decree, it ought to have been *certain* that the decree applied to the case of this very ship; and it ought to be equally certain, that it would have been put in force against the ship, had she arrived at *Barcelona*, and before she could have anchored 24 hours, in good safety. If there existed a reasonable *doubt* of danger in both, or in either of these respects, the case did not amount to that *just fear*, which the authorities cited by *Emerigon*, consider as equivalent to the application of physical force and violence. I cannot consider the danger of arrest and restraint at *Barcelona*, from this decree, to have been so certain and manifest, as to be, in any degree, a substitute for the arrest itself. It is well known to the world, that the *Spanish* decree was not a spontaneous measure, on the part of *Spain*. It was presented by a master, who had just traversed the continent, from the *Baltic* to the *Mediterranean*, occupied in the business of dictating laws, as well as of extending his conquests. The decree contains, upon the face of it, the marks of a constrained obedience; for it avows, in the preamble, that " I will, that there be adopted, in all my dominions, the same measures, which my intimate ally has adopted." Such an extraordinary measure as this *Aranjuez* decree, followed the *Milan* decree in 17 days, which was not much more than time enough for a communication between the one place and the other. It was not, therefore, to be expected, that a decree, violating every principle of law and justice, enacted in such haste, and made in subservience to the policy of an ally, and against the obvious policy of *Spain*, would be very scrupulously observed and enforced. A

ALBANY,
August, 1810.

CRAIG
v.
UNITED INS.
Co.

strong sense of interest would operate steadily to impede its execution. The decree admits, that the system which it adopts is "barbarous, and assimilated to the legislation of *Algiers*." The party ought, then, to have waited for proof of a practical application of the decree to a case like his, before he undertook to break up the voyage. No presumption ought, in decency, to be admitted, to supply the evidence of facts. Every presumption ought to have been indulged, in favour of the non-execution, or, at least, the most benign interpreta- of this decree by the admiralty courts in *Spain*. The captain, himself, did not consider the danger of arrest, at *Barcelona*, under the decree, as worth regarding; for he declares, that he broke up the voyage, from the danger of intermediate capture, and was persuaded, that if the vessel had arrived at *Barcelona*, the vessel and cargo might have been protected and saved, notwithstanding the decrees.

We are, therefore, of opinion, that the voyage was not broken up for any justifiable cause, or peril within the policy. The verdict is, consequently, against law, and must be set aside, with costs to abide the event of the suit.

New trial granted.(*a*)

(*a*) Since the decision of the above causes, I have met with the case of *Forster and others* v. *Christie*, (11 *East*, 205.) in the court of K. B. A *British* ship was insured from *Hull* to *St. Petersburgh*; and having sailed, under convoy, to the *Sound*, was, afterwards, stopped in her course, by a *British* ship of war, in the *Baltic*, from an apprehension of hostilities with *Russia*, for 11 days; and then proceeded to a point of rendezvous for convoy; until the officer of the ship of war received intelligence, that a hostile embargo was laid on *British* ships, at *St. Petersburgh*, when he ordered the fleet back to the place of rendezvous, from whence the ship returned to *Hull*. It was held, that the loss of the voyage was not attributable to the arrest or de- tainment of princes, &c. but immediately to the fear of the hostile embargo, in the port of destination, and, therefore, not within the policy; though, if the ship had not been detained, in the first instance, by the officer of the ship of war, she would have arrived at *St. Petersburgh*, in time to have delivered her cargo there, before the embargo was laid: