The opinion of the Court was delivered by
Colcock, J.
As it will be necessary to comment on every important fact proven by the supercargo, his testimony will not be stated more at length. The defendants contended, that the testimony was contradictory, and ought not to be believed; and that if the jury did credit it, that nevertheless, the plaintiff had not a right by law to abandon.
The jury were instructed, that if they believed the facts, yet, that the plaintiff could not legally recover, and they accordingly found a verdict for the defendants.
A motion is now made for a new trial, and twelve grounds are stated. I shall consider and dispose of them in their order.
1. That the verdict is contrary to law and evidence; because the testimony fairly proved, that the voyage insured, and for which so high a premium as seventeen and a half per cent, had been paid, was frustrated and ^'destroyed by the capture and detention of the property, and the interdiction of the said voyage, by the naval and admiralty authorities of Great Britain. And because after this interdiction, and the warning of the consequence of attempting the voyage, the re-seizure and condemnation of the vessel and cargo, on any attempt to renew the slave trade, were so eminent, certain and inevitable, as to authorize the assured to relinquish the voyage, and abandon to the assurers, as it was proven they did.
This ground involves the consideration of almost every material fact *95 and doctrine of law, which were considered in the case. The policy shows, that although a slave voyage was the principal object, yet, that the insured contemplated a trading in other goods; for in estimating the value of the return cargo, it says, “ on other articles at costs and charges.”
I shall first consider the case in relation to the slave voyage. The cases in which abandonment are allowed, are “capture, shipwreck, stranding, arrest of princes, or the entire loss of the effects insured.” And in general, it may be laid down, where, by the happening of any of the misfortunes or perils insured against, the voyage is lost, or not tvorfh pursuing, and the projected adventure is frustrated, or where the thing insured is so damaged or spoiled, as to be of little or no value to the owner, or where the salvage is very high, or where what is saved is of less value than the freight, or where further expense is necessary, and the insurer will not undertake, at all events, to pay that expense, the owner may abandon. (2 Marshall, 562, Condy’s Ed.
Capture and arrest afford the most frequent occasion for abandonment, and the plaintiff in this case claims the right to abandon, on the ground of capture, and the consequences resulting therefrom.
I lay out of view the right to abandon, on the ground of capture alone, because the abandonment was not made until after restoration; and the insured cannot abandon on the ground of capture alone, if he does not abandon, before he hears of the restoration ; (2 Marshall, 564;) and because, in this case, it is stipulated, *that the insured shall not abandon, until condemnation. But a restoration does not always deprive the insured of a right to abandon, for, as before stated, if in consequence of capture, the voyage is broken up, or not worth pursuing, he may yet abandon. The questions there presented on this ground, are:
1. Was the voyage broken up by the detention of the captors ?
The evidence is, that the vessel was captured on the 15th July, arrived at Sierra Leone on the 26th, and was restored on the 4th of August. The detention continued for twenty days, and four months were allowed by the policy for her stay and trade on the coast. There then remained sufficient time to complete the voyage.
2. Was the voyage broken up by the interdiction of the naval and admiralty authorities at Sierra Leone, or was it such a ground of fear, as, in law, will warrant an abandonment ?
At this period Spain and England were at peace. It cannot then be contended, that by the law of nations, the British Court of Vice Admiralty had any authority to condemn a Spanish vessel engaged in the slave trade. And this principle was recognized by the parties in the policy of insurance; for it is therein stipulated, that if the vessel be captured, the insured shall not abandon, until condemnation, thereby intending to secure the rights of the insurers in the event of illegal condemnation. It follows, then, not only that the Court of Vice Admiralty, at Sierre Leone, had no power to condemn, but the parties themselves were well informed on the subject. The fear which will justify an abandonment must be a just fear, amounting to the tos major, illustrated by “ the fear of being made a slave or prisoner, or of perishing in case of extremity, or where defence becomes impossible.” (Emerigon, 1 Tome, 507 to 512. Craig v. United Ins. Co., (6 Johns., 250.) Armory v. Jones, (6 Mass. Rep., 321;) Richardson, et al. v. Marine Ins. Co., *96 (Ibid. 121.) We are then to determine, whether there was any just *groun(l of fear; whether the danger was imminent and morally certain ? It cannot be contended, that there was anything like a vis major. The vessel was free to depart at any moment after the fourth of August. The British government had no right to capture a Spanish vessel engaged in the slave trade; and therefore this Court will not presume that they would have done so. It is true, that the supercargo states, that they did condemn some vessel, principally on this ground ; but this is not satisfactory proof of the fact. It is not the highest evidence the nature of the case admits. His information may have been incorrect, or his memory may have failed him. Can we rely on this evidence, where we find him misstating the ground of acquittal, as to his own vessel, as will hereafter appear ?
It is highly probably that as the British were at that period influenced by the zeal of new converts, that they may have excited some apprehensions in the mind of the supercargo. But it appears to my mind, to be as absurd to urge such circumstances, as a ground of abandonment, as it would be to say he was afraid of the gales which sometimes prevail on the coast at that Season. It is a clear and well settled principle in the law of insurance, that the fear of loss, is not the loss itself, and is no justifiable cause of abandonment. The supercargo wasthreatenedwith capture, but it was a mere threat, without any legal authority to support it. The abandonment proceeds from some other considerations, with which the insurers have no concern. 8 Johnson, 277, Corp v. Un. Ins. Co. 6 Johnson, 226, Craig v. Un. Ins. Co.
The second ground is, because it was fully proven, that on the arrest of the vessel, at Dominge, the captain was deprived of his command, deserted by his crew, and could never afterwards obtain any, but an American crew ; and American seamen are expressly forbidden by the laws of the United States, from navigating foreign vessels on a slave voyage, and would moreover, if employed in such a voyage, have subjected the proPerty condemnation on the coast. *And because this misfortune was a peril within the policy, either as a direct and immediate consequence of the capture, or simply as a loss from desertion, or as barratry in the mariners, and rendered the insurers liable for a total loss.
I shall examine the facts presented in this ground, and the law arising on them, in the order stated in the ground.
1. The captain was deprived of command.
That this cannot be considered as ground of abandonment has been already shown.
2. He was deserted by his crew.
This fact may be considered as proven, but it was also proven by the .supercargo, that another crew could have been obtained, and had been actually engaged, and that he did not employ them, because he could not feed two crews. How I lay it down as clear law, that he could have procured another crew, or recovered those who left the vessel, that he had no right to abandon. The mere fact of desertion by a crew does not warrant an abandonment, though the consequences resulting therefrom may do so. Was the reason given for not employing them a sufficient one ? Most certainly not; for the insurers would have been liable for the additional expense. He, then, by his own showing could have procured *97 another crew. Bat why could he not regain the mariners who had left the vessel ? The reason assigned, was, that he was afraid of exciting suspicions, that he meant to prosecute the slave voyage. That the seamen had received two months wages in advance. What better reason could exist than this, for attempting to regain his mariners ? They were necessary to navigate the ship, let her take what course she might, and having been paid in advance, were certainly to be preferred to any others. It is stated by the supercargo, that certain Americans, who had been taken on board vessels engaged in the slave trade, were put on board his vessel by the officers of government, and that he was compelled to receive them.
*The third fact stated, is, that American seamen are forbidden to navigate vessels engaged in the slave trade, and that this would have subjected the property to condemnation.
The admiralty of one nation have no right to carry into effect the laws of another. The Gourtney, 1 Edward’s Rep. 241. It would not then have been a legal ground for condemnation, if this vessel had been navigated by American seamen. But if a doubt could exist, as to such as would have voluntarily engaged, it is clear she might have been navigated by those who were forced on board. For the Act of Congress imposes a penalty on those only, who engage voluntarily on board of vessels in this trade. 1 Graydon’s Digest, 421-6, sec. 2 and 3. This, however, is only taking a view of the whole ground; for it is enough that the Spaish crew could have been obtained.
The last point in this ground is, that the desertion of the crew was barratry, and rendered the insurers liable for a total loss.
Barratry is defined to be, any act committed by the master or mariners, for an unlawful and fraudulent purpose, contrary to their duty to their owners, and whereby their owners sustain an injury. This general definition is illustrated by a specification of such acts as have been adjudged to be barratry, which is essentially necessary, when we remember the imperfection of language ; as running away with the ship ; wilfully carrying her out of the course of the voyage prescribed by the owners; sinking or destroying her ; embezzling the cargo ; smuggling, or any other offence, whereby the ship or cargo may be subject to an arrest, detention, loss, or forfeiture. 2 Marshall, 516. It is an offence punishable in England, by the 4th and 11th Geo. 1, and with us, by an Act of Congress, 1804, as well as at the common law. In order, therefore, to decide whether an act be barratry, it is necessary to .decide on the quo animo. It must be done with a fraudulent intent. Emerigon, Tom. 1, 371. Plyn v. Roy. Inc. Co. 7 T. R. 504. Hood v. Nesbit, 2 Dal. 137. *Crousillat v. Ball, 4 Dal. 294. Dederer Del. In. Co. C. C. U. S. P. Aprl. 1807. 2 Marsh. in note, 534 and 615, operating to the injury of the owner, or benefit of the mariner. In this case, where shall we look for evidence of criminal intention ? In going off with an advance of wages ? Surely not; for it was not an act of choice but necessity. The vessel, on being captured, was taken possession of by the British. These men might have been imprisoned. It was, therefore, proper to provide for their own safety. But supposing they were not strictly justifiable in leaving the vessel. Every illegal act is not a criminal one. They may have supposed they had a right to leave the vessel. And surely the conduct of their captain and supercargo was not calculated to make a different im *98 pression : for they never applied to the constituted authorities of the country to compel their return.
In the case of Wilcocks, et al. v. Un. Ins. Co. 2 Marsh. on In. 534, Chief Justice Tilghman says, “the counsel here raised some points of law, concerning which they request my opinion.” What is the duty of the crew of a neutral vessel captured and sent in for adjudication ? He answers as to the duty of the crew, “ they are not obliged to navigate her.” Surely, then, this crew were not obliged to navigate a vessel captured by a power at peace with them. The illegal and unwarrantable conduct of the captors furnished a sufficient excuse for the mariners ; and in the case alone referred to, the Chief Justice takes an able and comprehensive view of this doctrine. He says, “ I will now consider what is barratry. As it is an act committed by the master or mariners, over whom the insurers have no control, it has often been wondered, and it is, indeed, cause of wonder, that it should still keep its place in policies of insurance.” After saying, that he has examined all the authorities, both in England and America, he observes the result appears to establish two principles,
1. “ That any trick, cheat, or fraud, practised by the captain, (or, as we may add, the mariners,) to the prejudice of his owners, is barratry.”
*2. “ That any crime committed by the master, to the prejudice of his owners, is barratry.”
From which it is obvious, that the malo animo is indispensably necessary to constitute the crime. When we consider the relative situation of the mariners to the insured ; when we pursue the dictates of reason and of law, which forbid us to presume fraud, it is impossible to pronounce the act of these mariners, barratry. Can it be believed, that amidst the collisions by which the world has been agitated for years past, that no instance has occurred of a crew leaving a captured vessel under similar circumstance to those which exist in this case ? It would seem to be impossible ; yet, after the most diligent search, I have not been able to find any case in which such an act has been determined barratrous. It has been shown, that the loss of the crew did not break up the voyage, for he could have procured another.
The third ground is, because there was, at all events, a partial loss, and the offer of the company to return part of the premium, was equivalent to an adjustment of their loss ; and thei’e are counts in the declaration adapted to every ground of recovery. As to the first position in the ground, it cannot be controverted. They, the insured, are entitled to recover for a partial loss ; but they gave no evidence to the jury of the amount of that loss. The offer to return a part of the premium is not an adjustment of loss. The adjustment of a loss is the settling and ascertaining the amount of the indemnity which the insured, after all proper allowances and deductions have been made, are entitled to receive, and the proportion which each underwriter has to pay under the policy. To ascertain, with due precision, the amount of a loss, is sometimes a work of considerable difficulty. 2 Marsh. 611. The writer then goes on to state the rules by which such losses are to be determined. How the quantum of damages shall be ascertained; how the loss shall be aPPreciate(b &c. I have said no evidence was offered to prove a partial loss; none was claimed in the ^argument of the counsel. It *99 was, therefore, not a point before the jury. After the charge was delivered, by which it appeared that the Court were of opinion that the plaintiff was not entitled to recover, then the counsel requested that the jury should be instructed to find for a partial loss. But they were told by the Court, that the plaintiff could not recover; nor was it possible for them to have ascertained what the loss was. If a loss had been sustained, it should have been specifically proven. Opposing testimony may have been introduced. This, which is a work of difficulty,' even among those skilled in mercantile affairs, and in possession of all the necessary evidence, was required to be done by a jury upon the general evidence produced to support the right to abandon for a total loss.
The fourth ground stated, that a new trial should be granted on the ground of misdirection, and the various points are particularized.
1. In stating to the jury, that there was a contradiction in Barney’s testimony, when he deposed that the vessel engaged in the slave trade on the coast, were condemned for trading in slaves, and yet, that a Spanish ship bought the slaves which had been offered to him, while in the Rio Pongos ; whereas, it is submitted, that the facts are consistent, and condemnation for trading implies that there had been trading.
Before this point is determined, it is necessary to state that the testimony was written; and was sent out with the jury on their retirement. They were informed that it was their province to determine on the truth or falsity of it. That, if possible, it was their duty to reconcile’ the apparent contradiction. Their attention was then called to those parts of the testimony in which it contradicted itself. Under these circumstances, it was impossible that the jury could have been misled. They could perceive that the presiding judge was only taking notes of the testimony as read by the counsel, and that, therefore, no more was intended than to point their attention to the objectionable parts of the testimony, and to express his own opinion without intending that it should control their verdict.
But I will examine the objection, viz., “ a condemnation for trading implies trading,” therefore the judge erred in saying Barney had contradicted himself, when he said “ a vessel had traded, and yet that the trade could not be carried on.”
Now the error is not detected, if it appears that the conclusion is not inconsistent with the premises. Admit, that a condemnation for trading implies that there was trading, how does that prove that Barney did not contradict himself, in saying that no vessel could trade, and yet, that one had traded, which, it is obvious, he has said in the 12th and 20th answers. I fear too much has been said on this point. I proceed to the
2. In stating to the jury, that Spanish sailors could have been obtained after the release of the brig, when it appears by the evidence, that an act of the government at Sierra Leone prevented the master from availing himself of the only opportunity which offered to reship a Spanish crew.
In the answer to the tenth interrogatory, Barney says, “ the captain did actually engage a crew of Spanish sailors, eleven in number; but immediately upon her release, the American prisoners were mustered, and seven put on board. The views of the captain were frustrated by the order to take the Americans, nob having a sufficiency oí provisions to authorize the maintaining of a double complement. The evidence was ex *100 pressly referred to by the presiding judge. The jury were told to look to his tenth answer, and if they did so, it is clear they must have seen that a Spanish crew could have been obtained ; whether before or after the acquittal of the vessel is immaterial.
3. In stating to the jury, that they must disregard the testimony relative to the capture and condemnation of Spanish ships by the Admiralty at Sierra Leone; because the sentences themselves were the highest evidence. Whereas, it is submitted, that the testimony was legal; that the sentences, being res inter alios acta, *could not have been introdueed, and that even if the testimony had been secondary, the admission of the evidence ought to have been respected; and that the objection of the last counsel came too late.
The first rule of evidence is, that the best evidence that the nature of the case admits shall be produced. The declarations of Barney are certainly not the best evidence. If a doubt could have existed as to this, the witness has removed it; for he states in his sixth answer to the ten interrogatories, that he has said, and again repeats it, that it was in consequence of his causing a bill of lading to be fabricated by a Spanish captain, and procuring a letter from Mr. Faber at Dominge, that the brig was acquitted. It is not merely his opinion, but the Court took that ground in their decision. Upon looking into the proceedings of the Court, it appears that no such ground was taken by the Court. It is therein expressly said, that the vessel was captured on the ground, that she was an American vessel under Spanish colors, and was acquitted, because that was not proven. Here, then, is a practical illustration of the correctness of the rule which was laid down by the Court, that the proceedings of the Court of Yice-Admiralty were better evidence than the declarations of Mr. Barney. Nor was it an error to declare this, after his answers were read. It is only after all the evidence is heard, that the Court can decide whether it is competent; unless the objection be made before, and that was not done.
The other points of misdirection, which are stated, have been determined on in the observations on the general grounds, except that the jury were instructed that if the plaintiff had in view a trading in other articles than slaves, that there was an end of the question. This was stated, and it is only necessary to recur to the grounds of abandonment to show the correctness of the observation. It is, that the voyage was broken up. The vessel did trade in other articles, and it was believed by the Court, from the language of the policies, that was originally intended, 6n ^le event *certainly, of a disappointment in the slave voyage.) If this was the case, the voyage was not broken up, and whether it was, was left to the jury to decide. Upon the law, then, it does not appear that the plaintiff is entitled to a new trial. On the evidence, it is only necessary to observe, that admitting all that Barney has said to. be true, still he has not shown a legal right to abandon. But it was for the jury to decide, whether he is worthy of belief; and some serious objections to his credit were made. He.had shown, that he was capable of practising an imposition on a Court of justice, and one, which it is feared, must have been supported by perjury. His testimony is, at least, apparently contradictory. There is a disagreement between the captain and himself in relation to the number of men put on board at Sierra *101 Leone. His story is an improbable one. It cannot be believed, that the British government did condemn vessels bona fide Spanish, for trading in slaves. It is not probable, that a Court could have been induced to believe that empty water casks would have been made an article of export from the island of Teneriffe, particularly as the case was presented to the view of the Court, as a trading by a Spanish ship, with a Spanish crew and Spanish property, which might have induced a belief, in those concerned, that they had a right to trade in slaves. The impression on my mind,- at the time of trial, was unfavorable to the witness; but the jury were expressly told, that 'if they believed the captain was compelled to abandon the voyage in consequence of any circumsances resulting from the capture, and that in all his conduct he acted bona fide for the interest of all concerned, that they should find for the plaintiff.
Hayne and Simons, for the motion. ,Drayton and Priole'au, contra.
The majority of the Court being of opinion, that the plaintiff is entitled to a recovery for a partial loss, and the insurers having offered a return of the premium, except three per cent., a new trial is ordered, unless so much thereof be returned.
Bay, Gantt and Johnson, JJ., concurred.
Cheves, J.,
gave no opinion, having been *a stockholder in the company when the loss happened.
Nott, J., was holding the Circuit Court below, during the greater part of this term.